Darryl M. SAMUELS, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2015-SC-000180-DG

Supreme Court of Kentucky.

MARCH 23, 2017

COUNSEL FOR APPELLANT: Brandon Neil Jewell, Assistant Public Advocate.

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Leilani K.M. Martin, Assistant Attorney General.

OPINION OF THE COURT BY
JUSTICE CUNNINGHAM

Darryl Samuels was convicted of second-degree assault for fighting with, and biting off the ear of, a fellow inmate. A public defender from the local Department of Public Advocacy (DPA) office was appointed to represent him. Prior to trial, his counsel advised the trial court that another attorney in the local DPA office was representing the alleged victim in an unrelated matter. The court determined that this did not present a conflict of interest that would otherwise require appointment of new counsel and allowed the trial to proceed.

In this case, we are called upon to answer the following questions. Is a public defender's conflict of interest necessarily imputed to all other public defenders in the same Public Defender office? Of course the underlying and additional question is whether Samuels was denied his Sixth Amendment right to conflict-free counsel? The answer to both of these questions is no.

## I. Background

On July 9, 2008, Samuels and Christopher Gravett, his then-cellmate at the McCracken County jail, got into a physical fight in which Samuels bit off Gravett's ear. As a result, Samuels was charged with second-degree assault. His primary defense to the charge was self-defense. Carolyn Keeley, a public defender working in the DPA's Paducah trial office, was appointed to represent him.

In the meantime, Gravett had his own, unrelated legal trouble for which a different public defender from the Paducah office, John Johnson, was appointed to represent him. Gravett ultimately pleaded guilty in that matter, and Johnson's representation of him ended when his motion for shock probation was denied on May 12, 2009, eight days before Samuels's trial on the alleged second-degree assault of Gravett.

On the morning of Samuels's trial on May 20, Keeley disclosed to the trial court, among other things, her office's past representation of Gravett, which she (incorrectly) believed was still then ongoing. At that time, she also provided a waiver for Samuels to sign that laid out the potential conflict. But he refused to sign the waiver and requested the appointment of new counsel. The trial court denied the request, concluding that there was no conflict, and ordered the trial to proceed.

Samuels was convicted of second-degree assault and sentenced to ten years in prison.

He appealed to the Court of Appeals, claiming that the trial court's refusal to appoint new counsel had violated his right to conflict-free counsel under the Sixth Amendment. He argued that a conflict of interest resulted from Keeley's past representation of two prosecution witnesses and from the Paducah Trial Office's dual representation of him and Gravett. Although the audio of the pre-trial in-chambers discussion where these potential conflicts were brought to the trial court's attention was largely inaudible, the Court of Appeals discerned that there had been "very little questioning" by the trial court on this issue. In light of this, the Court of Appeals held that "[b]ecause a conflict of interest is such a pivotal question, . . . a new hearing is required, complete with findings of fact and conclusions of law." The case was thus remanded for "[t]he trial court [to] determine if the two witnesses and victim were being actively represented by Samuels' defense counsel or the Paducah DPA in general and whether or not there was a conflict of interest."

On remand, the only conflict argued by Samuels pertained to the Paducah Trial Office's overlapping representation of Gravett. (The issue of whether the past representation of the two witnesses presented conflicts of interest was abandoned and is no longer an issue in this case.)

At the evidentiary hearing, Keeley testified that she did not think that the overlapping representation had created an actual conflict of interest. And her supervisor, Directing Attorney Chris McNeill, testified similarly. Keeley testified that, despite this belief, she had raised this issue with the court and attempted to have her client waive any potential conflict "out of an abundance of caution." There was also testimony that neither Keeley nor Johnson, the Paducah public defender who had represented Gravett, had worked on or known anything about the other's case.

Following the hearing, the trial court determined that Samuels had not demonstrated that an actual conflict had existed at his trial. In particular, the court found that Samuels had not shown that Keeley had been unable to fully represent him or

that she had taken or omitted any actions as a result of the alleged conflict. The court also found that no complaint had been raised about Keeley's cross-examination of Gravett, nor had any confidential information been shared about Samuels or Gravett as a result of the dual representation.

Samuels again appealed to the Court of Appeals, who this time affirmed, but for different reasons. Despite finding error in many of the trial court's findings and conclusions, as will be discussed in detail below, the Court of Appeals agreed in the end that Samuels had not shown that his lawyer had an unconstitutional conflict of interest during her representation of him.

This Court granted Samuels's motion for discretionary review and affirms.

## II. Analysis

### A. Samuels and Gravett had adverse interests during Samuels's criminal proceedings.

 Criminal defendants have the right under the Sixth Amendment—as applied to the states by the Fourteenth Amendment, *see Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)—"to have the Assistance of Counsel for [their] defence." U.S. Const. amend. VI. This "right to counsel is the right to the effective assistance of counsel." *United States v. Cronic*, 466 U.S. 648, 654, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). And the right to effective assistance of counsel includes the right that counsel be conflict-free. *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680 (1942), *superseded in part on other grounds by* Fed. R. Evid. 104(a) ("[T]he 'Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unim-paired by a court order requiring that one lawyer shall simultaneously represent conflicting interests."); *see also Bartley v. Commonwealth*, 400 S.W.3d 714, 719 (Ky. 2013).

The upshot of the Court of Appeals' opinion is that it affirmed the trial court's ultimate conclusion that Samuels's public defender had no actual conflict of interest while representing him—in other words, that he received the conflict-free counsel to which he was entitled under the Sixth Amendment. In signing off on that, however, the Court of Appeals first criticized several aspects of the trial courts' findings and conclusions. So we begin our discussion by addressing and agreeing with those criticisms.

 First, the Court of Appeals was correct to take issue with the trial court's findings to the extent they focused on the performance of Samuels's attorney. Specifically, the trial court's decision relied, in part, on its findings that "no showing was made that Ms. Keeley was unable to give her best representation"; "[n]o showing was made that Ms. Keeley took steps or omitted actions that would have helped either the Defendant or Mr. Gravett"; and "[n]o complaint [w]as ... made at her attempts to cross-examine Mr. Gravett...."

 The appeals court was correct to point out that in cases such as this, where an alleged conflict of interest is raised at or before trial, the standard set forth in *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), governs. Under *Holloway*, to prevail on a Sixth Amendment claim of denial of the right to conflict-free counsel where the conflict was raised at or before trial, a defendant need only show that a conflict of interest existed. *Id.* at 487-91, 98 S.Ct. 1173. On the other hand, where the alleged conflict is

raised at some later point during post-conviction proceedings, the standard set forth in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), controls. *See Bartley*, 400 S.W.3d at 719. That more stringent standard requires the defendant to demonstrate both that a conflict existed and that it prejudiced him— i.e., that it adversely affected his counsel's performance—in some cognizable way. *Id.*

■ But "whenever a trial court improperly requires joint representation over timely objection reversal is automatic." *Holloway*, 435 U.S. at 488, 98 S.Ct. 1173. Notably, in contrast to claims raised for the first time post-conviction, there is no requirement that the defendant show a conflict actually prejudiced him or impacted his counsel's performance in some way. *Beard v. Commonwealth*, 302 S.W.3d 643, 645–47 (Ky. 2010). So, as the appeals court below made clear, the correct inquiry is whether Samuels demonstrated that Keeley was actually conflicted; the adequacy of the assistance she provided in representing him is irrelevant to that inquiry.

■ Second, the Court of Appeals was correct in clarifying that the right to conflict-free counsel under the Sixth Amendment attaches at "the initiation of adversary judicial criminal proceedings." *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 198, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008) (quoting *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)). Indeed, the Supreme Court has recognized that "to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Maine v. Moulton*, 474 U.S. 159, 170, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

■ So the trial court erred to the extent it treated the conflict issue as involving only past, not simultaneous, represen-

tation. Instead, as the Court of Appeals correctly noted, the focus of the Sixth Amendment inquiry here is on whether there was any overlap in DPA's representation of Samuels and Gravett at any point during Samuels's criminal proceedings and, more importantly, whether an actual conflict of interest accompanied that overlapping representation. If an actual conflict of interest existed at any point after the initiation of Samuels's criminal proceedings, it cannot have been erased merely because it ceased prior to the commencement of his trial.

Third, and last, the Court of Appeals was correct to criticize the trial court's focusing on what Gravett stood to gain from testifying against Samuels—according to the lower court, nothing—in analyzing whether their interests were even conflicting. The trial court seemed to have been influenced by the fact that Gravett's testimony at Samuels's trial could not have impacted any outstanding charges against him or otherwise resulted in the Commonwealth somehow treating him more or less favorably. Because Gravett had already been convicted and denied shock probation by the time he testified at Samuels's trial, the trial court perceived that testifying against Samuels stood to confer no benefit upon Gravett. This apparently led the trial court to conclude that the two's interests were not adverse, or at least were not so adverse as to be problematic.

■ But as this Court has recognized, a conflict of interest may arise through simultaneous representation of a criminal defendant and a prosecution witness. *Beard*, 302 S.W.3d at 647. And here Gravett was not only a witness but the victim of the alleged crime. It should go without saying, as the Court of Appeals below acknowledged, that "[t]he victim of a crime is not a detached observer of the trial of the accused." *Castillo v. Estelle*, 504 F.2d

1243, 1245 (5th Cir. 1974). And this is especially so in cases such as this where self-protection is raised as a defense, thus putting the defendant's and alleged victim's credibility directly at odds and at issue. The victim's interests in such a situation are so innately adverse to the accused's that there is simply no way that a single lawyer could simultaneously represent both. Doing so would doubtless violate the defendant's Sixth Amendment right to counsel.

So, as these principles make clear, Samuels's right to counsel would certainly have been violated had Keeley represented both him and Gravett. But that is not this case, where Gravett was instead represented by Johnson, another public defender who worked in the same trial office as Keeley.

The question becomes, then, whether the potential conflict arising from Johnson's representation of Gravett during portions of Samuels's criminal proceedings should be imputed to Keeley solely by virtue of their both working for the DPA's Paducah Trial Office. We agree with the Court of Appeals that it should not.

## B. Samuels failed to demonstrate that his lawyer had an actual conflict of interest under the Sixth Amendment.

█ Boiling his argument down to its essence, Samuels is urging this Court to hold, as a matter of law, that all conflicts of interest of public defenders be imputed to the other public defenders employed in the same local trial office for purposes of the Sixth Amendment right to conflict-free counsel. We are being asked to lay out a bright-line rule that a per se Sixth Amendment violation occurs any time a criminal defendant is represented by a DPA lawyer who works in the same office as another DPA lawyer who happens to represent interests adverse to the defendant's, even on wholly unrelated matters. If that were

the rule, then Samuels would be entitled to reversal.

Samuels argues that two of our ethics rules require this result. First, he cites Supreme Court Rule 3.130-1.7, which prohibits lawyers from "represent[ing] a client if the representation involves a concurrent conflict of interest." SCR 3.130-1.7(a). The rule goes on to provide that "[a] concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client." SCR 3.130-1.7(a)(1). In other words, Keeley would have violated this ethical rule if she had personally simultaneously represented Samuels and Gravett.

█ Of course, that is not what happened. Acknowledging this, Samuels also invokes Supreme Court Rule 3.130-1.10. He argues that the two rules operate in tandem to make Keeley conflicted in her representation of Samuels due to her coworker Johnson's representing Gravett at the same time. Rule 3.130-1.10 imputes the conflicts of a lawyer who practices in a firm to all of the other lawyers in the firm—it provides, in part, that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule[ ] 1.7." SCR 3.130-1.10(a).

Samuels argues that local DPA offices are no different than private law firms under this rule such that Johnson's representation of Gravett should be imputed to Keeley, resulting in a conflict of interest. This is a question of first impression for this Court, although we have previously had occasion to acknowledge that "[w]hether and to what extent public defender organizations are to be deemed 'firms' under the rule imputing one attorney's conflicts to other attorneys in his or her firm ... are questions many courts have wrestled with over the years." *Bart-*

*ley v. Commonwealth,* 400 S.W.3d 714, 719 n.5 (Ky. 2013) (citing cases).

As Samuels emphasizes, our ethics rules define "firm" or "law firm" as "a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or *lawyers employed in a legal services organization* or the legal department of a corporation or other organization." SCR 3.130-1.0(c) (emphasis added). There is little dispute that the Department of Public Advocacy is a "legal services organization."

Samuels, however, does not argue that the entire DPA should be considered a firm for conflict-of-interest purposes. Instead, he proposes a manageable compromise of treating only each local trial office individually as a separate firm, which he surmises is all that is needed to promote the conflicts rules' purposes. And to be sure, he finds support for this position in the Comments to Rule 3.130-1.0, which state that "[w]hether two or more lawyers constitute a firm ... depend[s] on the specific facts." For example, we must consider if the practitioners "share office space," "consult or assist each other," and whether they "have mutual access to information concerning the clients they serve." In specific regard to legal aid and legal services, the Commentary states that "[d]epending upon the structure of the organization, the entire organization or different components of it may constitute a firm or firms for purposes of these Rules." So Samuels's argument, which is based on our ethics rules and our commentary to those rules, would certainly seem to be a reasonable one. And adopting a bright-line rule, with its predictability and uniformity of application, is an attractive course to take.

 But as attractive as Samuels's easy-to-administer rule might be, this case requires us "not to enforce the Canons of Legal Ethics, but to ... assure vindication of the defendant's Sixth Amendment right to counsel." *Mickens v. Taylor,* 535 U.S. 162, 176, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). Indeed, the scope of the right to effective assistance of counsel under the Sixth Amendment is not dictated by state ethical rules. *See Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("[B]reach, of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel."). So conduct that might lead to a conflict under our ethical rules will not necessarily lead to an unconstitutional conflict for Sixth Amendment purposes.

There are compelling reasons against constitutionalizing state ethical standards. "[A] court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts." *Id.* In the recent words of the Supreme Court of Colorado, "[w]ere it otherwise, this court could redraw the boundaries of the Sixth Amendment each time the Rules of Professional Conduct are revised." *West v. People,* 341 P.3d 520, 531 n.10 (Colo. 2015). Or perhaps the opposite would be true—were we to hold that the conflict-of-interest rules in their current form define the boundaries of the Sixth Amendment right to counsel, that may be tantamount to locking them in a sort of constitutional amber, forever precluding any future amendment of their terms. Neither of these outcomes would be tolerable.

We are holding that the attorneys' ethical obligations under our Rules of Professional Conduct do not define the scope of

Samuels's Sixth Amendment rights. Therefore, we must ascertain whether the facts here nevertheless demonstrate that his lawyer had an actual conflict of interest that violated his right to conflict-free counsel. In this regard, we also agree with the appeals court's turning to the individual circumstances of this case.

When the totality of the circumstances are examined, it becomes clear that Samuels has not demonstrated that his lawyer was burdened by an actual conflict of interest during her representation of him. As the Court of Appeals noted, the undisputed facts were that Keeley never represented Gravett, knew nothing about the details of Johnson's representation of him, and owed no direct duties to him. And the same was true for Johnson as to Samuels. There was no evidence that Keeley and Johnson collaborated or were otherwise involved in each other's cases during the period of overlapping representation. Nor was there any evidence that the two accessed, or had access to, the confidential client communications and information of the other. Instead, the only proof of a potential conflict was the happenstance of one Paducah DPA lawyer's representing Gravett on unrelated matters for a period of time which overlapped another Paducah DPA lawyer's representation of Samuels. This, without more, is insufficient to show a conflict of interest in violation of the Sixth Amendment. Simply and only because they were both public defenders in the same office is not enough. That is the only "bright line" rule we can abide.

### III. Conclusion

For the reasons explained above, the Court of Appeals' opinion affirming the trial court's decision finding that Samuels received conflict-free counsel, as guaranteed under the Sixth Amendment, is affirmed.

All sitting. Minton, C.J.; Cunningham, Hughes, Keller, VanMeter, Venters, and Wright, JJ., concur. Hughes, J., concurs with separate opinion in which Minton, C.J., and VanMeter, J., join. Wright, J., concurs with separate opinion in which Keller, J., joins.

HUGHES, J., CONCURRING:

In affirming Samuels's assault conviction, the Court rejects his contention that his attorney rendered ineffective assistance because her representation was tainted by a conflict of interest. I concur but I write separately to express concerns the Court does not address.

Throughout the assault proceedings against him, Samuels was represented by Carolyn Keeley, an attorney from the Department of Public Advocacy's (DPA's) Paducah trial office. Gravett, the victim of Samuels's assault, had been in the past and was, until about eight days before the commencement of Samuels's trial, represented by another attorney from DPA's Paducah office, John Johnson. Samuels contends that under our Rules of Professional Conduct, Johnson's representation of Gravett is to be imputed to Johnson's office colleague, Keeley, and that Keeley's resulting "multiple" representation of both defendant (Samuels) and victim/prosecution witness (Gravett) was so inherently conflicted as to violate Samuels's Sixth Amendment right to "conflict free" counsel and to implicate the "automatic reversal" rule applied by this Court in *Beard v. Commonwealth*, 302 S.W.3d 643, 645-47 (Ky. 2010), and by the United States Supreme Court in *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

The Court rejects this contention, and I agree that "the happenstance of one Paducah DPA lawyer's representing Gravett on unrelated matters for a period of time

which overlapped another Paducah DPA lawyer's representation of Samuels ... is insufficient [by itself] to show a conflict of interest in violation of the Sixth Amendment." *Samuels v. Commonwealth*, 2015-SC-000180-DG, slip opinion p. 13. For a couple of reasons, however, I am not content to stop there.

First, I am compelled to comment on the Paducah DPA office's apparently cavalier approach to shielding its clients from intra-office conflicts. While it may be that DPA offices need not bear the full brunt of the conflict rules that ordinarily apply to law firms—an issue the Court leaves for another day—the apparent disregard of those rules in this case is disturbing. To state the obvious, a red flag should go up in any DPA office when a client and the alleged victim of that client's assault were both inmates of the local detention center. Given the heavy caseload carried by DPA across the Commonwealth, it stands to reason that there is a good possibility that the victim is a local DPA client. Here the office appears to have employed no screening or "early warning" system because there is no record of a standard conflict detection procedure which, for whatever reason, failed in this particular case. If the conflict had been detected at the outset or even at a time further removed from trial,[1] the trial court's options with regard to both inquiring into the potential conflict and exploring possible responses to it would have been far broader. This case underscores the necessity of the DPA office developing and executing an effective intra-office conflict detection system to avoid future recurrences.

Turning to the legal issue, Samuels maintains that this case comes within the automatic reversal rule the United States Supreme Court established in *Holloway*, *supra*. In that case, the trial court appointed a single public defender to represent three codefendants. Some weeks before trial, that counsel advised the court that the joint representation was conflicted and moved for the appointment of separate counsel for each defendant. Following minimal inquiry, the trial court denied the motion and thereafter rebuffed counsel's many renewed objections to the joint representation, including one final motion for separate counsel just before the jury was sworn. At trial, all three defendants chose to testify, and, effectively hamstrung by his competing duties to each, counsel had to find his way through direct examination of each client and then cross-examination to advance the interests of his other two clients.

In these circumstances, the Supreme Court believed that counsel's judgment regarding the existence of a disabling conflict was entitled to deference, and it presumed, moreover, "that the conflict, 'which [the defendant] and his counsel tried to avoid by timely objections to the joint representation,' ... undermined the adversarial process." *Mickens v. Taylor*, 535 U.S. 162, 168, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (quoting *Holloway*, 435 U.S. at 490, 98 S.Ct. 1173). Accordingly, the Court reversed the conviction and stated that "[W]henever a trial court improperly requires joint representation over timely objection reversal is automatic," even without any particular showing of prejudice. 435 U.S. at 488-89, 98 S.Ct. 1173.

As Samuels notes, this Court applied *Holloway*'s automatic reversal rule in *Beard*, *supra*, a case in which a public defender appointed to represent an alleged

---

1. Samuels was charged with the assault in August 2008 and trial did not commence until

May 20, 2009.

drug trafficker had previously represented (and would likely represent again) the confidential informant who was the defendant's main accuser. Prior to trial, Beard moved *pro se* for new counsel on the basis of the alleged conflict, but the trial court denied the motion. It relied largely on counsel's assurance that he had learned nothing during his prior representation of the confidential informant that would interfere with his representation of Beard.

At trial, counsel's cross-examination of the informant was apparently thorough, including questions concerning the informant's possible interest in cooperating with the police so as to obtain favorable treatment in a pending probation revocation proceeding (a proceeding at which counsel was apt to represent the informant). Counsel's potential conflict not having been shown to have had an adverse effect on his representation of Beard, the Court of Appeals affirmed the conviction.

Reversing, this Court held in *Beard* that the Court of Appeals applied the wrong standard of review. *Holloway's* automatic reversal rule applied, we stated, whenever, as in Beard's case, the alleged conflict of interest "is actually raised at trial." 302 S.W.3d at 646. That rule, the Court said, did not require a showing of prejudice, including adverse effect on counsel's representation. Rather, it required only a showing of "an actual conflict," which the Court understood as "competing duties or interests that create the *potential* for prejudice." 302 S.W.3d at 647.

Samuels insists that, under *Beard*, he too "actually raised" the conflict issue at trial and thus called into play the *Beard/Holloway* automatic reversal rule. He contends, furthermore, that Keeley's representation of *him* at the same time Keeley's office colleague Johnson was representing Gravett—there being few interests more "competing" than those of de-

fendants and their alleged victims—had to have created at least the *potential* for prejudice, else why would we have rules imputing one firm member's conflicts to other members of the firm?

The Court, as noted, rejects Samuels's suggestion that *vicarious* conflicts present the same potential for prejudice that we found existed in counsel's *direct* conflicts in *Beard*. I agree and believe the Court's result is firmly justified by the Supreme Court's narrowing of *Holloway's* automatic reversal rule in *Mickens*, *supra*. In *Mickens*, which involved a conflict alleged to have arisen when an attorney was appointed to represent a murder defendant after having previously represented the victim, the Court surveyed its attorney-conflict-of-interest cases, including *Holloway*, and expressed concern that the lower federal courts were applying them too expansively.

With respect to *Holloway*, the *Mickens* Court explained that its automatic reversal rule only applies when "counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." 535 U.S. at 168, 122 S.Ct. 1237. Outside those narrow circumstances, the Court explained, a trial court has the

> duty to inquire into the propriety of a multiple representation ... only when "the trial court knows or reasonably should know that a particular conflict exists," ... which is not to be confused with when the trial court is aware of a vague, unspecified possibility of conflict, such as that which "inheres in almost every instance of multiple representation."

*Mickens*, 535 U.S. at 168-69, 122 S.Ct. 1237 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 347-48, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). Moreover, the *Mickens* Court explained, even when the trial court fails to make the "*Sullivan*-mandated inquiry"

into a particular conflict, in order for a court to void the conviction it is "at least necessary ... for petitioner to establish that the conflict of interest adversely affected his counsel's performance." 535 U.S. at 174, 122 S.Ct. 1237. In other words,

> [T]he *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.

535 U.S. at 172 n.5, 122 S.Ct. 1237. As a number of courts have noted, *Mickens* thus put a new gloss on attorney conflict-of-interest cases,[2] and under *Mickens*, in my view, Samuels's claim clearly fails.

Unlike *Holloway*, this case does not involve a defense counsel "forced to represent codefendants over [her] timely objection." On the contrary, not only are there no codefendants, but Keeley told the trial court that she did not think the potential intra-office defendant/victim-witness conflict interfered in any way with her ability to represent Samuels. She raised the matter only "out of an abundance of caution," and because Samuels had refused to execute a waiver of any conflict that might exist. Under these circumstances, Samuels was clearly not entitled to an "automatic reversal" card.

Keeley's disclosure did invoke the trial court's duty under *Cuyler v. Sullivan* to inquire into the potential conflict, and the trial court duly inquired not just once, but twice—both at the time of Keeley's initial, ninth-hour raising of the matter and again more extensively upon remand from the Court of Appeals. Both times the trial court found that Keeley's representation of Samuels was not impaired by her office colleague's unrelated representation of Samuels's alleged victim. Under *Mickens*, that ruling does not entitle Samuels to relief unless he can show that Keeley's vicarious conflict did, after all, adversely affect Keeley's representation.[3] Inasmuch as Samuels has not even attempted, much less made out, such a showing, I agree that Samuels's conviction should be affirmed.

In closing, the DPA office's apparently lax handling of the conflict in this case should be an anomaly. Notwithstanding that concerning laxness, however, the Supreme Court has made clear that Samuels's Sixth Amendment ineffective assistance claim requires more than mere formal irregularity; it requires some showing of substantive impact. Since Samuels has made no such showing, his claim for relief was properly denied.

Minton, C.J.; and VanMeter, J., join.

WRIGHT, J., CONCURRING:

While I agree with both the majority and with Justice Hughes's concurring opinion, I write separately to address the issue of whether the DPA's conduct in this case might constitute an ethical violation. I believe the DPA is different from a private firm. In the typical private firm, monetary success is linked to the outcome of its cases—whether through contingent fees or through public opinion (through referrals or lack thereof) based upon that outcome. However, since DPA attorneys are salaried government employees, the same con-

---

**2.** *See, e.g., West v. People*, 341 P.3d 520 (Colo. 2015); *Schwab v. Crosby*, 451 F.3d 1308 (11th Cir. 2006); *People v. Morales*, 209 Ill.2d 340, 283 Ill.Dec. 544, 808 N.E.2d 510 (2004); *United States v. Blount*, 291 F.3d 201 (2nd Cir. 2002).

**3.** To the extent this requirement conflicts with *Beard*, which makes no reference to *Mickens*, I believe that *Mickens* controls.

cerns simply do not apply here. The only agenda DPA attorneys should have is to represent their clients' interest to the best of their abilities. Furthermore, I disagree with the majority's contention that "there is little dispute that the Department of Public Advocacy is a "legal services organization" for purposes of our rules. Such organizations (like AppalRed, for example) have a specific focus and goal—and a team of lawyers working together to push their agendas. DPA's only agenda should be representing its clients to the best of its abilities.

As a government employee tasked with representing defendants to the best of his or her abilities, a DPA attorney would not have a conflict simply because, a *different* attorney (who also happens to be employed by the government) has a conflict. The same would hold true whether the two DPA attorneys were working in the same or different offices. The real issue is whether the attorney with the conflict had access to files or information that may compromise the case. In this case, the trial court held hearings and determined that the attorneys were unaware of any information that might have compromised Appellant's representation. This issue could be resolved in any future cases by adequate screening for conflicts and separation of any information or files.

The majority based its decision on the Sixth Amendment—and I agree with its result and analysis.

Keller, J., joins.